UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| JOHN T. SMITH; TALMADGE OWENS;ELRICH TOLBERT; BESSIE MONTGOMERY; CAROLYN WINGIELD ; LARRY CHAMBLISS; JOHNNY TOLBERT, JR; MARILYN CHAMBLISS; ZYKIYAH CHAMBLISS; DIVINE CHAMBLISS; APTIVA CHAMBLISS; TEVIN CHAMBLISS; KEENA CHAMBLISS; RODERICK CHAMBLISS; JOSHUA CHAMBLISS ; DEONTEZ NOLEN; AUDRA BARTAIN; MINNIE CRAWLEY; CHRISTINE DAVIDSON; BLINDA DAVIS; CARNIE GARDNER; NEIL GLADNEY; MILLEY GLADNEY; GERTRUDE GREEN; ROBERT EARL HARRIS; SALLIE M. HARRIS; JOHNNIE HENDRIX; MELVIN JOHNSON; THERESA JOHNSON; JOHNNY KING; RACHEL KING; ROBERT KING; CURTIS LAWRENCE; INELL LAWRENCE; JOANN LAWSON; WILLIE ROOKS; DARPHINE SMITH; LATANYA Q. SMITH; LOIS TERNELL; JANICE TINDLE; FRANK WRIGHT; CLARA WRIGHT; CECELIA ANN HILL; JOANN SINGLETON GLASS; WILMA GLENN; HAROLD T. MASON; JAMES D.L. MOORER; CAMELITA WRIGHT; GAYLAN WRIGHT; CRYSTAL WRIGHT; RODERICK A. BROWN; MARGARET BROWN; JERRY W MURRELL , | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
|       Plaintiffs, | ) ) |
|       vs. | )      CV 05-B-2326-S ) ) |

**EVANSTON INSURANCE COMPANY,** )
)
    **Defendant.** )

## MEMORANDUM OPINION

This case is presently pending before the court on defendant's Motion for Summary Judgment. (Doc. 27.) Plaintiffs have sued defendant Evanston Insurance Company, seeking to satisfy a Consent Judgment against defendant's alleged insured. Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment, (doc. 27), is due to be granted and plaintiffs' claims are due to be dismissed.

### I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing no genuine issue of material fact and that he is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the non-moving party need not be given the benefit of every inference but only of every ***reasonable*** inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II. STATEMENT OF FACTS

Process Knowledge Corporation [hereinafter PKC"] was incorporated in 1985 by Timothy McCollum and Mike Klinner. (Doc. 29, Ex. 9 at 13-14.) PKC is in the business of "recycling and material handling." (*Id.* at 14-15.) In May 2002, McCollum and Klinner incorporated KMAC Organics, L.L.C., "to do composting"[1] to make organic fertilizer. (*Id.* at 15; *id*, Ex. 10 at 16.)

---

[1] "Composting is an aerobic biological process that converts organic waste into a stable organic product that can be used onsite or transported offsite for use. . . . Compost has been viewed as a valuable soil amendment for centuries."

http://www.epa.gov/agriculture/tcop.html

In order to create the fertilizer, KMAC Organics composted ground up eggshells, wood waste, orange juice, and cola. (*Id.*, Ex. 9 at 114-16.) KMAC Organics obtained these materials from companies that had agreements with KMAC Services to pick-up their waste products. (*Id.*) McCollum testified that PKC did business under the name KMAC Services. (*Id.* at 13.) PKC, doing business as KMAC Services, was paid for handling the "waste" from other companies used in the composting operations. (*Id.* at 104, 115-17.) This income was used to fund the operations of KMAC Organics. (*Id.* at 104-05, 117.) All sales and expenses for KMAC Organics were kept separate from the sales and expenses for PKC. (*Id.* at 42-43.)

In February of 2003, KMAC Organics leased a facility on Wenonah Road. (*Id.*, Ex. 9 at 36-37.) Shortly after KMAC Organcis began operating the Wenonah Road facility, residents in the surrounding community began complaining about the smell. (*Id.*, Ex. 9 at 82-83.)

On June 26, 2003, plaintiffs filed suit in state court against KMAC Organics, KMAC Services, and the fictitious defendant identified as "ABC," which the Amended Complaint defined as "a person, firm, corporation, partnership, limited liability company or other entity doing business as KMAC Services, whose capacity and legal identity are presently unknown." (*Id.*. Ex. 2.) The Complaint referred to "[a]ll Defendants . . . jointly as 'KMAC'". (*Id.* ¶ 7.) The Complaint identified KMAC Organics and KMAC Services as "organic compost manufacturer[s]." (*Id.* ¶¶ 3, 4.) In the state-court Complaint, plaintiffs

4

alleged that KMAC's composting activity had created a public nuisance and constituted a trespass against plaintiffs.  (*Id.* ¶¶ 8, 11, 12.)  They alleged:

> 10.  KMAC's rotting and decaying mass of chicken carcasses and feces has created a public health hazard and nuisances in the surrounding communities.
>
> (a) . . . KMAC's facility has created strong, foul, noxious odors and gases that permeate the area;
>
> (b) . . . The smell is so offensive that residents cannot leave their homes or walk outside without holding their breath;
>
> (c)  The putrid smell was so repulsive, that many people have been made nauseous and sick.  Residents are suffering headaches, respiratory problems, nausea and eye irritations;
>
> (d)  The odor and gases penetrate into homes and get into carpets, drapes, curtains, and clothing, as well as automobiles;
>
> (e)  The KMAC facility has attracted millions of flies which are breeding maggots and feeding on the rotting chicken carcasses, and are migrating into the surrounding communities;
>
> (f)  The KMAC facility has become a breeding ground for harmful bacteria . . .;
>
> (g)  The chicken feces composted by KMAC contain large amounts of nitrogen, phosphorous and potassium.  Poultry "litter" includes fecal droppings, antibiotic residues, heavy metals, cysts, larvae, decaying carcasses, and sawdust.  Excess nitrogen converts to ammoniate and nitrates, poisoning plants, ground and surface waters.  Excretory ammonia fumes from the nitrogen in decomposing droppings damages the respiratory systems of humans.  Heavy metals include arsenic, a known carcinogen[,] that when inhaled can cause cancer in humans, particularly lung cancer;
>
> . . .

      (h)    Chicken carcasses composted by KMAC contain E. coli, salmonella, listeria and campylobacter bacteria. These pathogens can pose grave risks to children, the elderly, and those with compromised immune systems; and

      (i) The offensive smell created by KMAC has reduced property values through the surrounding communities.

(*Id.* ¶ 10.) Plaintiffs alleged that they had suffered "illness, sickness, medical expenses, and damage to real and personal property" because of "KMAC's operation." (*Id.* ¶ 11.)

After hearing testimony, the state court entered an Order on July 23, 2003, finding the KMAC defendants liable for a nuisance and ordering them to cease operations at the Wenonah Road facility; the court held:

      In March 2003 KMAC began composting where egg shells, chicken embryos, wood chips and sugar water were mixed in a large building. Approximately 6000 tons of this material is on site presently.

      The composting process creates a strong, foul, noxious odor and gases, which have enveloped the entire community at least from March 2003 to June 2003. This odor is so repulsive that many of the Plaintiffs could not leave their homes or walk outside. These Plaintiffs complained of headaches, respiratory problems, nausea, and problems with the odors penetrating into their clothes and their homes.

      The KMAC facility is a breeding ground for flies and rats according to the plaintiffs. This nuisance has interfered with the ability of the Plaintiffs to enjoy their property.

      . . .

      There is no doubt in the Court's mind that the Defendants have created a nuisance. This nuisance is one for which the Court has the power to close the business in order to abate the nuisance. . . .

6

> The Court finds an injunction to be the proper remedy to restrain repeated or continuous conduct by the Defendant due to there being no adequate remedy at law and because it would take a [multiplication] of actions to obtain the necessary relief for the Plaintiffs. In reviewing other cases where odors and flies had emanated from the Defendant['s] property onto the Plaintiff's land and into his home disturbing his comfort and affecting his health, the Court has found the appropriate remedy to be abatement by injunction.
>
> In order to abate the nuisance, the Court orders the Defendants to . . . locate a facility outside of any residential community so that any foul, noxious odor will not affect other people. To file for the proper zoning of that facility so as to meet all requirements of any local, state, or Federal regulation for odor or gas emissions. After this facility is located . . ., the Defendant is to begin removing the compost material from the . . . Wenonah road site.

(*Id.*, Ex. 3 [internal citations omitted].) At this time, the issue of plaintiffs' damages remained pending. (*Id.*)

On or about October 1, 2003, plaintiff filed an Amended and Restated Complaint that added additional plaintiffs and PKC as a defendant. (*Id.*, Ex. 4.) Plaintiffs amended their Complaint a second time on December 29, 2004. (*Id.*, Ex. 5.) The second Amended and Restated Complaint added claims of negligence and/or wantonness and public nuisance against McCollum and Klinner. (*Id.*, Ex. 5 ¶¶ 2B, 17, 18.)

On August 26, 2005, the state court entered a Consent Judgment for $1,020,000.00 against "the corporate Defendant, KMAC." (*Id.*, Ex. 6; *id*, Ex. 7 at 4.) The Consent Judgment stated, "The Plaintiffs have agreed to collect the Judgment from the corporate Defendant, KMAC, only to the extent that KMAC's insurance provides coverage." (*Id.*, Ex. 6 ¶ 1.) Plaintiff instituted garnishment proceedings against defendant Evanston Insurance

7

in the state court on or about October 3, 2005. (Doc. 1, Ex. 3.) Defendant removed the garnishment proceeding to this court. (Doc. 1.)

Defendant issued a general liability policy to "KMAC-Process Knowledge, Inc.," as the named unsured.[2] (Doc. 29, Ex. 1 at 00005.) The Supplemental Declarations page stated that KMAC-Process Knowledge, Inc., was a "recycling collection center," located at 2631 Shuttlesworth Drive in Birmingham, Alabama. (*Id.* at 00006.)

Part 4 of an endorsement to the policy, M/E-001 (4/00), [hereinafter the "Pollution Exclusion"] excluded claims based on pollution, environmental impairment, and contaminations; the Pollution Exclusion provided:

> Under 2. Exclusions, f. Pollution, Commercial General Liability Coverage Form, Section I. - Coverages, Pollution/environmental impairment/contamination is not covered under this policy, nor are any expenses nor any obligation to share damages with or repay anyone else who must pay damages from same in conjunction with occurrences arising or alleged to have arisen out of same. ***All liability and expense arising out of or related to any form of pollution***, whether intentional or otherwise and whether or not any resulting injury, damage, devaluation, cost or expense is expected by any Insured or any other person or entity ***is excluded throughout this policy***. All wording is replaced by the following:
>
> (A) "Bodily injury," "Personal injury," "Property Damage" or Damages for the devaluation of property, or for taking, use or acquisition or interference with the rights of others in or on property or air space, or any other type injury or expense; or
>
> (B) Any loss, cost, expense, fines and/or penalties arising out of any (1) request, demand, order, governmental authority or directive or that of

---

[2]KMAC-Process Knowledge, Inc., is not a legal entity. (Doc. 29, Ex. 9 at 153, 156.)

8

> any private party or citizen action that any Insured, or others, test for, monitor, clean up, remove, contain, treat, detoxify or neutralize or in any way respond to or assess same the effects of pollutants, environmental impairments, contaminants or (2) any litigation or administrative procedure in which any Insured or others may be involved as a party as a result of actual, alleged or threatened discharge, dispersal, seepage, migration, release, escape or placement of pollutants, environmental impairments, [or] contaminants into or upon land, premises, buildings, the atmosphere, any water course, body of water, aquifer or ground water, whether sudden, accidental or gradual in nature or not, and regardless of when.

(*Id.* at 00010 [emphasis added].)  The Pollution Exclusion defined "Pollutants" as "any solid, liquid, gaseous, fuel, lubricant, thermal, acoustic, electrical, or magnetic irritant or contaminant, including but not limited to smoke, vapor, soot, fumes, fibers, radiation, acid, alkalis, petroleums, chemicals or waste." (*Id.* at 00011.)  "Waste" was defined to include "medical waste and all other materials to be disposed of, recycled, stored, reconditioned or reclaimed." (*Id.*)

Also, the policy contained an endorsement entitled "Amendment to M/E-001," M/E-001A (7/01), which amended part 5 of M/E-001(4/00). (*Id.* at 00012.)  This endorsement provided:

> 5. Asbestos, Lead, Silica Dust, Mold, Bio-organic Growth or Mildew are not covered under this policy, nor are any expenses nor any obligation to share damages with or repay anyone else who must pay damages from same in conjunction with occurrences arising or alleged to have arisen out of:
>
> (a)   "Bodily injury," "Personal injury," "Property Damage" or Damages of any type, arising out of the inhalation, ingestion, physical exposure to, absorption of, or toxic substances from asbestos, lead, silica dust, mold, bio-organic growth or mildew in any form, or from any goods, products or structures containing same; or

9

(b) Existence of asbestos, lead, silica dust, mold, bio-organic growth or mildew, in any form, in occupancy or construction, or the manufacture, sale, transportation, handling, storage, disposal, or removal of same, or goods or products containing same; or

(c) Any supervision, instructions, recommendations, requests, or warnings or advice given or which should have been given, as well as any costs, including but not limited to abatement, mitigation, removal, containment, treatment, detoxification, neutralization, or disposal of same or in any way respond to assess the effects of same.

(*Id.* at 00012.)[3]

## DISCUSSION

Alabama law provides:

> Any ambiguities in an insurance contract must be construed liberally in favor of the insured. A corollary to this rule is that exceptions to coverage must be interpreted as narrowly as possible in order to provide maximum coverage to the insured. However, courts are not at liberty to rewrite policies to provide coverage not intended by the parties. In the absence of statutory provisions to the contrary, insurance companies have the right to limit their liability and write policies with narrow coverage. If there is no ambiguity, courts must enforce insurance contracts as written and cannot defeat express provisions in a policy, including exclusions from coverage, by making a new contract for the parties.
>
> We have consistently held that coverage under an insurance policy cannot be enlarged by waiver or estoppel, since these doctrines can have a field of operation only when the subject matter is within the terms of the policy. The reason behind this rule is that waiver and estoppel cannot operate to change the terms of a policy so as to cover additional matter.

*Johnson v. Allstate Ins. Co.*, 505 So. 2d 362, 365 (Ala. 1987)(internal citations omitted).

---

[3] This amendment added exclusions for mold, bio-organic growth, and mildew to the previous exclusion of claims arising from asbestos, lead, and silica dust. (*Compare id*, Ex. 1 at 00012 with *id.*, Ex. 1 at 00011.)

Defendant contends, *inter alia*, that plaintiffs' claims are due to be dismissed because such claims are excluded by the Pollution Exclusion. Plaintiffs claim they were injured by the composting activities at the Wenonah Road facility. The Pollution Exclusion excluded claims arising from pollutants, which include waste material. This unambiguous language excludes all claims arising from or related to the composting operations at the Wenonah Road facility.

Plaintiffs contend that the Pollution Exception does not mention pollutants; they argue:

> Part (A) of the Endorsement, clearly and unambiguously excludes coverage for bodily injury, personal injury, property damage or damages for the taking or devaluation of property (ie. actions in the nature of nuisance and inverse condemnation that may also result in mental anguish). This exclusion makes no reference whatsoever to "pollution" or "pollutants" and is clearly an effort by the insurer to isolate itself only from liability in the nature of nuisance that causes mental anguish or the devaluation of adjoining real estate.
>
> Part (B) of the Endorsement clearly and unambiguously excludes coverage for any loss, cost, expense, fines and/or penalty arising out of (1) government ordered clean-up of pollutants or (2) litigation or administrative procedure resulting from allowing pollutants into or upon land, air, water, etc. Clearly, this exclusion is an effort by the insurer to isolate itself [from] the liability of protracted legal fights often associated with the discharge of pollutants and the contamination of land under CERCLA and other environmental statutes. This exclusion makes no reference whatsoever to "Bodily injury," "Personal injury," "Property Damage" or Damages.

(Doc. 33 at 21.) Plaintiffs' argument is not supported by the record.

As set forth above, the Pollution Exclusion contains specific reference to pollution.[4]

---

[4]As set forth above, Part 4 provides:

. . . Pollution/environmental impairment/contamination is not covered under this policy, nor are any expenses nor any obligation to share damages with or repay anyone else who must pay damages from same in conjunction with occurrences arising or alleged to have arisen out of same. ***All liability and expense arising out of or related to any form of pollution***, whether intentional or otherwise and whether or not any resulting injury, damage, devaluation, cost or expense is expected by any Insured or any other person or entity ***is excluded throughout this policy***. All wording is replaced by the following:

(A)  "Bodily injury," "Personal injury," "Property Damage" or Damages for the devaluation of property, or for taking, use or acquisition or interference with the rights of others in or on property or air space, or any other type injury or expense; or

(B)  Any loss, cost, expense, fines and/or penalties arising out of any (1) request, demand, order, governmental authority or directive or that of any private party or citizen action that any Insured, or others, test for, monitor, clean up, remove, contain, treat, detoxify or neutralize or in any way respond to or assess same the effects of pollutants, environmental impairments, contaminants or (2) any litigation or administrative procedure in which any Insured or others may be involved as a party as a result of actual, alleged or threatened discharge, dispersal, seepage, migration, release, escape or placement of pollutants, environmental impairments, [or] contaminants into or upon land, premises, buildings, the atmosphere, any water course, body of water, aquifer or ground water, whether sudden, accidental or gradual in nature or not, and regardless of when.

Pollutants mean any solid, liquid, gaseous, fuel, lubricant, thermal, acoustic, electrical, or magnetic irritant or contaminant, including but not limited to smoke, vapor, soot, fumes, fibers, radiation, acid, alkalis, petroleums, chemicals or waste. Waste includes medical waste and all other materials to be disposed of, recycled, stored, reconditioned or reclaimed.

(Doc. 29, Ex. 1 at 00010-11.)

12

(Doc. 29, Ex. 1 at 00010-11.)  Sections (A) and (B) set forth the types of claims – such as bodily injury and government fines – that are excluded if they "aris[e] out of or [are] related to any form of pollution."  (*Id.*)   Plaintiffs' argument that sections (A) and (B) can be read without reference to the remainder of part 4 is contrary to established law.  *See American Resources Ins. Co. v. H & H Stephens Const., Inc.*, 939 So. 2d 868, 873 (Ala. 2006)("[A] court cannot consider the language in the policy in isolation, but must consider the policy as a whole.")(quoting *Nationwide Ins. Co. v. Rhodes*, 870 So. 2d 695, 696-97 (Ala. 2003) (quoting *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 308-09 (Ala. 1999) (citing *Turner v. United States Fidelity & Guar. Co.*, 440 So. 2d 1026 (Ala. 1983)))); *see also James River Ins. Co. v. Ground Down Engineering, Inc.*, No. 07-13207, ____ F.3d ____, 2008 WL 3850687, 4 (11th Cir. Aug. 20, 2008)(interpreting identical provision to exclude coverage for insured engineering firm in lawsuit alleging that insured had negligently failed to discover construction debris and underground fuel tanks during environmental site assessment).

The court finds that plaintiffs' claims are excluded under the unambiguous terms of the Pollution Exclusion.  Therefore, defendant's Motion for Summary Judgment is due to be granted.  Because the court finds that plaintiffs' claims are excluded from coverage under the policy issued to KMAC-Process Knowledge, the court pretermits discussion of defendant's other grounds for summary judgment.

**CONCLUSION**

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendant is entitled to judgment as a matter of law. An Order granting defendant's Motion for Summary Judgment, (doc. 27), will be entered contemporaneously with this Memorandum Opinion.

**DONE**, this 14th day of September, 2008.

*Sharon Lovelace Blackburn*
SHARON LOVELACE BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE